**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

VALENTINE AKPA,

               Plaintiff,                     Case No. 1:18-cv-07512

        v.                                   Judge Charles P. Kocoras
                                          Magistrate Judge Gabriel A. Fuentes

NORTHWESTERN MEMORIAL
HEALTHCARE, NORTHWESTERN
MEMORIAL HOSPITAL,

               Defendants.

---

**DEFENDANTS' REPLY**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

---

       Plaintiff's rebuttal to Defendants' Motion for Summary Judgment is based on "metadata" that he does not understand and conjecture that he cannot support. The "evidence" Plaintiff claims will prove his case consists of: (1) an expert report that opens with the sentence "[t]he question of whether or not certain email files were manipulated is inconclusive;" (2) his own assessment of his and others' qualifications for the CPE residency position Plaintiff sought; and (3) his speculative interpretation of certain emails about which the authors or recipients have actually testified. Plaintiff cobbles these together in an unsuccessful attempt to create an issue of fact as to Defendants' motivation for rejecting his application for a spot in Defendants' 2018-2019 chaplain residency program.

## I.      PLAINTIFF'S NON-COMPLIANCE WITH LOCAL RULE 56.1(d)(5)

       Northern District Local Rule ("LR") 56.1 sets forth mandatory requirements for both movants and non-movants on summary judgment. Among those requirements, LR 56.1(d)(5)

provides that "[a] movant's LR 56.1(a)(2) statement of material facts must not exceed 80 numbered paragraphs. An opposing party's LR 56.1(b)(3) statement of additional facts must not exceed 40 numbered paragraphs. A party must seek the court's permission before exceeding these limits." Notwithstanding these requirements, Plaintiff without the Court's permission submitted a Statement of Additional Facts that included 136 numbered paragraphs. See Dkt. No. 304.

Plaintiff's failure to comply with the Local Rules is not excused by his *pro se* status. *See, e.g.*, *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *Perez v. Chicago Board of Education*, Case No. 10-CV-7594, 2013 WL 12114074, *1 (N.D. Ill. Aug. 2, 2013). *See also*, Dkt. No. 264 ("Notice to Pro Se Litigant Opposing Motion for Summary Judgment by Northwestern Memorial Healthcare, Northwestern Memorial Hospital,") and *Morris v. City of Chicago*, 545 Fed. Appx. 530, 531-32 (7th Cir. 2013) (Notice required under Rule 56.2 was "flawed," but there was no legal effect where no prejudice to plaintiff resulted, as shown by plaintiff's filing of documents, including his affidavit, in opposition).

Defendants respectfully submit that the Court should properly exercise its discretion and decline to consider any of Plaintiff's facts beyond the 40 allowed by the Local Rule. See, e.g., *Perez v. Bd. of Educ. of the City of Chicago*, 576 Fed. Appx. 615, 617 (7th Cir. 2014), *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014) (upholding district court's decision to strike fact statements in excess of 40, even where plaintiff argued that the "complexity" of the case justified the submission of additional facts).

## II.  <u>PLAINTIFF HAS MISSTATED AND/OR MISCHARACTERIZED EVIDENCE THROUGHOUT HIS RESPONSE TO DEFENDANT'S FACTS AND HIS OWN FACT STATEMENT.</u>

Plaintiff has been warned multiple times, by multiple judges, about misstating and mischaracterizing evidence. See e.g, Dkt. Nos. 227, 109, 214. See also, Exhibit 1, Transcript of

Proceedings Before the Honorable Gabriel A. Fuentes, Magistrate Judge, August 26, 2021, pp 5, 15, 16, 20-21.   Yet his fact statement and his response to Defendant's fact statement are rife with misrepresentations and exaggerations regarding the record materials he cites in opposition to Defendants' motion.  For example:

- In paragraph 14 of Defendant's Statement of Fact, Defendants aver that "Bradley began accepting applications, conducting interviews, and making offers to candidates for the 2018-2019 CPE residency starting in the fall of 2017."  Plaintiff disputes the statement, asserting that "Defendants offered the . . . position to Joshua Daniel *for the first time* on or about June 28, 2018 . . . Defendants offered the . . . position to Kathleen North-Wilhelm *for the first time*, on or about July 10, 2018 . . . Defendants offered the . . . position to HaLana Thompson *for the first time* on or about July 10, 2018."  (Response to Defendants' Local Rule 56.1 Statement of Undisputed Material Fact, ¶14) (emphasis added).  Plaintiff cites to "Tab B, Exhibit 2, Washington Depo., p. 101; Tab D, Exhibits 2, 3, 4, 9, 10 in support of his contention.  Not one of the sources Plaintiff cites even suggests—let alone supports—that the offers made by Defendants' Talent Acquisition Professionals were the first offers made to the identified candidates.[1]

- In Paragraph 20(a) of Plaintiff's Additional Statement of Facts, Plaintiff states that "[Michael] Washington testified thus, "I don't think I saw an application for your residency, sir, and I wouldn't have interviewed someone if I didn't see their application."  In support, he cites his Tab B, Exhibit 2, which is Michael Washington's

---

[1]     Indeed, in his response to Paragraph 14 of Defendant's fact statement, Plaintiff has violated almost every aspect of Local Rule 56.1.  In addition to misstating evidence, Plaintiff does not identify the document to which Tab B or Tab D are attached, inserts new facts regarding Bradley's vacation schedule, makes a legal argument regarding authentication of evidence, and cites inadmissible evidence (his own testimony which is not based on personal knowledge).

deposition transcript, at pages 72 and 135. But a review of the transcript shows that (a) nothing on page 72 shows that Washington testified in any manner about Plaintiff's application; (b) page 73, lines 22-24 and page 74, lines 1-3 show that Washington testified that he did not remember receiving or reviewing Plaintiff's application; and (c) page 135, lines 18-24 show that Washington testified with respect to Stiofan O'Murchadha, and not Plaintiff, Washington testified that "I wouldn't have interviewed someone if I didn't see their application."

- In both his response to paragraph 15 of Defendant's Statement of Fact, and in support of paragraphs 4 and 5 of his own Additional Statement of Facts, Plaintiff blatantly mischaracterizes his email correspondence with Susan Curran. Plaintiff states that Susan Curran sent Plaintiff CPE residency application materials and told him that there were still spots open in the *residency* program. Curran was responding to Plaintiff's February 13, 2018 inquiry about Defendants' *summer* CPE program and their separate *residency* program. What Curran's email actually states is that spots were still open in the *summer* program. Tellingly and as Plaintiff has been want to do in his efforts to mislead throughout this litigation, Plaintiff failed to include with his fact statement the materials Curran provided to Plaintiff which were directed to the summer program, and not the residency program. (Pl's Facts, Tab D, Exh. 7, p. 4; Def's Facts, Tab I Decl. of S. Curran ¶¶ 9-10, Exh. 5, 6.)

- In response to paragraphs 16 and 17 of Defendant's Statement of Fact, in addition to improperly including legal argument regarding authentication of documents, Plaintiff stated that offers had not been made to Kathleen North-Wilhelm or Ariell Watson on January 9, 2018—notwithstanding Defendants' authenticated email evidence to the

contrary—because an email from Michael Washington to Joshua Daniels dated January 31, 2018 said that Mark Bradley had "been away for three weeks and we decided before his going that we wouldn't respond before meeting as a four-person team." (Pl's Facts, Tab D, Exh. 1). The cited record does not support Plaintiff's conclusion.

Based on the above-described mischaracterizations, unsupported conclusions, and omissions—as well as others identified herein—the Court should exercise its discretion to deem admitted the corresponding Defendants' statements of fact and ignore or strike Plaintiff's statements of fact. *See, e.g., Little v. JB Pritzker for Governor*, Case No. 18 C 6954, 2021 WL 3666429, *3 (N.D. Ill. Aug. 18, 2021) ("Plaintiffs either mischaracterized, drew tenuous and unsupported conclusions from, or omitted necessary context from the record. The Court will not consider these statements."), *citing Bone Car Int'l, LLC v. Pentech Pharm, Inc.*, 741 F. Supp. 2nd 854, 856 n. 1 (N.D. Ill. 2010)( ("Where a party has offered a...statement of fact without offering proper evidentiary support, the Court will not consider that statement.").

### III. IT REMAINS UNDISPUTED THAT NEITHER PLAINTIFF'S RACE NOR HIS NATIONAL ORIGIN FACTORED INTO DEFENDANTS' DECISION NOT TO SELECT HIM FOR THE 2018-2019 CPE RESIDENCY.

As discussed in Defendants' opening brief, summary judgment in an employment discrimination case boils down to a single question: "Whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity . . . or other proscribed factor caused the  . . . adverse employment action." *Johnson v. Advocate Health and Hosp. Corp.*, 892 F.3d at 894, citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016). *See also*, *Chatman v. Bd. of Educ. City of Chi.*, 5 F. 4th 738, 746 (7th Cir. 2021). In answering whether the available evidence, taken as a whole, supports such a conclusion, courts still often employ the familiar burden-shifting approach found in *McDonnell Douglas Corp. v. Green*, (411 U.S. 792

(1973)) as an "efficient way to organize, present, and assess evidence in discrimination cases."

*Johnson v. Advocate Health and Hosp. Corp.*, 892 F.3d at 894 (*citations omitted*).

The Seventh Circuit has often referred to summary judgment as the "'put up or shut up' moment in litigation." *See, e.g., Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010. As the court has instructed, that means a "non-moving party is required to marshal and present the court with the evidence [he] contends will prove [his] case." *Id.* The evidentiary materials submitted by a non-moving party to ward off summary judgment "must do more than show that there is some metaphysical doubt as to the material facts, . . . and must present definite, competent evidence in rebuttal." *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1113 (7th Cir. 2013). The evidence marshaled by Plaintiff in this case, when considered as a whole, would not permit a reasonable fact finder to conclude that the Plaintiff's race or national origin caused Defendants not to hire him.

A. **Plaintiff fails to rebut that Ariell Watson, Kathy North-Wilhelm, and Joshua Daniel received and accepted offers for the residency prior to Plaintiff's application.**

Plaintiff does not dispute that the first date on which he submitted application materials for the 2018-2019 CPE residency was February 24, 2018. (Pl's Facts, ¶6.) Whether proceeding under *Ortiz* or *McDonnell Douglas*, Plaintiff needs to demonstrate that he applied for a position for which Defendants were seeking applicants in order to establish discrimination with respect to a hiring decision. *Milbrook v. IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir. 2002); *See also, Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d at 894-95.

Emails authenticated by Defendants demonstrate that Defendants conveyed offers of a position in the 2018-2019 CPE residency program to Ariell Watson, Kathy North-Wilhelm, and Joshua Daniel, and that all three accepted those offers, prior to February 24, 2018, when Plaintiff

first submitted application materials.  (Def's Facts, ¶¶ 15-18.)  In other words, by the time Plaintiff

applied for a spot in the 2018-2019 CPE residency, Defendants were no longer seeking applicants

for three of the four spots.  These emails have all been produced to Plaintiff in hard copy, imaged,

and native form at various points in this litigation.  Defendants' witness, Susan Curran, the

custodian of the email address that sent and received the emails has authenticated them in a

declaration attached as an exhibit to Defendant's statement of fact.  (*Id.*)  And, out of an abundance

of caution, Defendants engaged an expert witness to review the underlying metadata associated

with those emails to confirm that those metadata matched with the senders, recipients, and dates

reflected on the faces of the emails.  *(Id.)*

But Plaintiff insists that the emails are not to be believed, and that all four spots in the

2018-2019 residency remained open.  He bases his insistence on several arguments, addressed in

turn below.

1.    Plaintiff's Expert's Opinion.

First is Plaintiff's own expert's report, which shows at most that the emails changed in

some unspecified way as they passed through various email gateways between sender and

recipient.[2]  Plaintiff's expert, however, opens her report by noting that "[t]he question of whether

or not certain email files were manipulated is inconclusive." (Pl's Facts, Tab A, Exh. 2

("Introduction")).  Plaintiff asked his expert to opine with respect to the emails in which Watson,

Wilhelm, and Daniel accepted the offers from Defendants "Whether the email is altered in any

way."  For each of the emails, the answer was "no."  (Pl's Facts, Tab A, Exh. 2, pp. 4-6).  In sum,

---

[2]    Because Plaintiff's expert's report and the opinion contained therein do not create any genuine issue of
material fact, for purposes of summary judgment only, Defendants are not challenging Plaintiff's expert
under *Daubert*.  Defendants reserve the right to make such a challenge if and as warranted if the case
proceeds beyond summary judgment.

Plaintiff's expert witness' opinion fails to rebut Defendants' evidence regarding the dates of offer and acceptance to three of the four residents.[3]

       2.    <u>Defendant's Expert's Report</u>

Plaintiff also challenges Defendants' evidence by suggesting that Defendants' expert witness, Yaniv Schiff, report is unreliable. Plaintiff misconstrues the purpose for which Schiff's report was submitted. Plaintiff attempts to argue that Schiff's approach and methods are insufficient under Federal Rule of Evidence 902(14)—regarding self-authentication of data copied from an electronic device, storage medium, or file—to authenticate emails submitted by Defendants in support of their motion for summary judgment, in particular the emails showing (a) the dates on which Defendants offered 2018-2019 CPE Residency spots to Ariell Watson, Kathleen North-Wilhelm, Joshua Daniel, and HaLana Thompson and (b) the dates on which those individuals accepted the offers. (See, e.g., Pl's Facts, ¶¶ 100-101.) In support, Plaintiff cites to a number of documents, including educational or promotional materials authored or presented by Schiff that address authentication of electronic records under Federal Rule of Evidence 902(14). (See Pl's Facts, ¶¶ 102-108.) Those materials suggest practices that will satisfy the requirements for self-authentication under Federal Rule of Evidence 902(14).

Defendants did not, however, submit Schiff's report for purposes of authentication. Susan Curran, the author or recipient of the referenced emails, authenticated them in her declaration, also submitted in support of Defendants' Motion. (Def's Facts, ¶¶ 16-18, 21; Tab I, Declaration of S.

---

[3]      Plaintiff also contends that the offer emails to Watson, Wilhelm, and Daniel are dubious because the copies that were examined by his expert were forwarded emails attached to the acceptance emails discussed above. Forwarded emails, according to Plaintiff's expert, do not retain their own metadata. (Pl's Facts, Tab A, Exh. 2, p. 3). The omission is not particularly significant, given Plaintiff's expert's conclusion that the acceptance emails—all of which were sent prior to Plaintiff submitting application materials on February 24, 2018—were unaltered. But Defendants note that Plaintiff had the offer emails for Joshua Daniel and Ariell Watson—produced as NMH-E-002774 and 002712, respectively—but chose not to provide them to his expert. Plaintiff cannot intentionally omit evidence, and then use the omission to create a fact issue.

Curran, ¶¶ 5-8, 11, 17-20.) The emails are therefore admissible under Federal Rule of Evidence 901(b)(1), which allows authentication via the testimony of a witness with knowledge that the "item is what it is claimed to be." Fed. R. Evid. 901(b)(1).

Defendants submitted Schiff's report to address Plaintiff's unfounded insistence throughout this litigation, including in his deposition, that Defendants had altered the dates and times that appeared on the face of those emails. Schiff's report is admissible under Federal Rule of Evidence 702 for that purpose.

Federal Rule of Evidence 702 governs the admissibility of expert witness testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Where a party proffers an expert's opinion, courts serve as a "gatekeeper," ensuring that the testimony is not only relevant, but reliable. *In re Jimmy John's Overtime Litigation*, Case No. 14 C 5509, 2018 WL 3231273, *9 (N.D. Ill. June 14, 2018), citing *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 589 (1993). Here, Plaintiff does not appear to challenge the relevance of expert Yaniv Schiff's opinion, only its reliability; and Plaintiff's argument appears to be only that the principles and methods used by Mr. Schiff were unreliable.[4] But Plaintiff fails to develop any argument, and merely cites to paragraphs 101-128 in his statement of facts—all of which are statements that are well in excess of the 40 that Plaintiff is allowed pursuant to Local Rule 56.1. For that reason alone, the Court may ignore Plaintiff's "challenge" to Schiff's expert report.

---

[4]    Plaintiff includes a two-line assertion in his response brief, at page 24, asserting that "Defendants' expert testimony deviated from Federal Rule of Evidence (Pl's Facts, 100) and from acceptable practice within the expert's field (Pl's Facts, 101-116, 118-122-123, 128)."

In any event, as noted above, the paragraphs cited by Plaintiff (a) are not supported by admissible evidence, and (b) do not establish that Schiff's expert opinion is unreliable under *Daubert* standards. Plaintiff argues no basis other than his own judgment regarding Schiff's methods in support of his contention that Schiff's report is unreliable. *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014). Defendants respectfully submit that the Court may properly consider Yaniv Schiff's expert report and the opinion therein.

### 3. Michael Washington's January 31, 2018 Email

Plaintiff argues that an email sent from CPE Supervisor Michael Washington to Joshua Daniel on January 31, 2018 in which Washington advises Daniel he cannot answer Daniel's question about the timing of residency offers because "Mark [Bradley] has been away for three weeks and we decided before his going that we wouldn't respond before meeting as a four-person team." (Pl's Facts, ¶¶ 27, 52, 62; Pl's Resp. to Def's Facts, ¶¶ 15-17). Bradley testified that he did not recall taking a three-week vacation and does not know the basis for Washington's representation that Bradley had been gone for three weeks. (Pl's Facts, ¶ 52). Washington testified that he did not recall the email or whether any offers were made to residents earlier than January 31, 2018. (Pl. Response to Def's Facts, ¶¶ 15-17). Plaintiff, however, reads into the email—without any support—that Defendants did not offer residency spots to Ariell Watson and Kathleen North-Wilhelm on January 9, 2018.[5] Neither Bradley and Washington's failure to recall details from January of 2018, nor Plaintiff's bare speculation, are sufficient to create any genuine issue of material fact. *Hutchison v. Fitzgerald Equip., Co.*, 910 F.3d 1016, 1021-23 (7th Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.* 475 U.S. 574, 586 (1986)) (inability to recall certain facts created "metaphysical doubt" rather than any genuine issue of material fact); *Herzog*,

---

[5] Although not dispositive, the Court may take judicial notice that three weeks prior to January 31, 2018 was January 10, 2018, one day after the offer emails were sent to Wilhelm and Watson.

742 F.3d at 806 ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.")

    4.    <u>Defendants' Talent Acquisition Professionals' Offers in June and July 2018.</u>

Finally, Plaintiff asserts that Defendants' email evidence is controverted by evidence showing that offers were not made to any of the residents until June and July 2018. (Pl's Response, pp. 5, 11, 16-19); Pl's Facts, ¶¶ 27, 52, 62; Pl's Resp. to Def's Facts, ¶¶ 15-17). Defendants do not dispute that emails formally offering the residency to Watson, Wilhelm, Daniel, and HaLana Thompson were sent in June or July of 2018, and have explained that Defendants' Human Resources policies in place at the time required such an approach. (Def's Facts, ¶ 13). Plaintiff, by turn, does not explain, let alone provide evidence or authority in support, why the later "formal" offers negate the earlier offers communicated by Bradley (through Curran) and accepted by the residents. Without such support, this argument fails as well. *See, e.g., Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived,"); *Colburn v. Trustees of Indiana University*, 973 F.2d 581, 593 (7th Cir. 1992) (Affirming summary judgment for defendant where plaintiff "failed to inform [the court] of a legal or factual basis for their . . . claim.").

**B.**    **Plaintiff has not shown any material fact dispute regarding Defendants' reason for rejecting him and offering the fourth residency position to HaLana Thompson.**

Plaintiff offers his own assessment of his qualifications to dispute that Mark Bradley felt that HaLana Thompson's two internships at Northwestern Memorial Hospital, made her a better candidate for the residency than Akpa. *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th at 746 (7th Cir. 2021) ("For a failure-to-hire claim, one example of a legitimate non-discriminatory reason a defendant may offer is that the individuals ultimately hired were better candidates than the

plaintiff,"); *Dunn v. Nordstrom*, 260 F.3d 778, 787 (7th Cir. 2001) (plaintiff's own self-appraisal does not create a genuine issue of material fact.) *See also, Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 747 (7th Cir. 2021) (fact that individual hired had volunteered at the school where he was hired was legitimate, non-discriminatory reason for selecting him over plaintiff, who had more formal training;) *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 839-40 (7th Cir. 2009) (employer hiring a research assistant had a legitimate, non-discriminatory reason to hire a candidate who had experience as a research assistant for the company.)

Plaintiff also claims that Defendants' alleged treatment of other applicants supports his contention that Defendants' stated reasons for not selecting him for the residency are pretextual. (Pl's Resp., pp. 6-11). In this respect, Plaintiff asserts that Defendants treated similarly situated individuals outside of his protected classifications more favorably than him. In addition to Thompson, who is Black and of U.S. national origin, Plaintiff points to Stiofan O'Murchada, who is White and of Irish national origin, and Toni Daniels, who he claims is Black and of U.S. national origin. *Id.* The problem with Plaintiff's argument as to O'Murchadha and Daniels is that, like Plaintiff, neither one was selected for the final open residency position—i.e., they were not treated differently than he was. Plaintiff suggests that the two were treated more favorably than he was because Bradley and his team selected them, but not Plaintiff, for an interview. Plaintiff fails to explain or provide any authority to support how an interview alone is more favorable treatment, and does not offer any evidence that an interview would have made a difference with respect to Defendants' assessment of his qualifications or fitness for the residency. This lack of support dooms the argument. *See, e.g., Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived,"); *Colburn v. Trustees of Indiana University*, 973 F.2d 581,

593 (7th Cir. 1992) (Affirming summary judgment for defendant where plaintiff "failed to inform [the court] of a legal or factual basis for their . . . claim.").

Plaintiff also suggests that with respect to the 2018-2019 CPE residency and previous years' residency programs, Defendants have generally excluded Nigerian and Black applicants. (Pl's. Resp., pp. 8-9.)   To the extent Plaintiff is attempting to argue a pattern or practice on Defendants' part, his evidence falls short of what is required to create a genuine issue of material fact sufficient to prevent summary judgment. *Milbrook v. IBP, Inc.*, 280 F.3d 1169, 1177 (rejecting plaintiff's pretext argument based on anecdotal evidence of other Black candidates that were not selected for promotion.)

Because none of the record evidence shows that Defendants' stated reasons for not selecting Plaintiff for the 2018-2019 CPE Residency were pretextual, Plaintiff's claims under both Title VII and Section 1981 should be dismissed.

## CONCLUSION

Nothing in Plaintiff's filings in response to Defendants' Motion for Summary Judgment show that there is any reasonable basis for a fact-finder to conclude that Plaintiff's race or national origin were factors in Defendants' decision not to offer him a position in the 2018-2019 Clinical Pastoral Education Residency at Northwestern Memorial Hospital.  For the reasons stated herein, and in Defendants' opening memorandum in support of their Motion for Summary Judgment, Defendants respectfully requests that the Court grant summary judgment in favor of Defendants and dismiss Plaintiff's Complaint in its entirety, with prejudice.

Respectfully submitted,

NORTHWESTERN MEMORIAL HOSPITAL
HEALTHCARE AND NORTHWESTERN
MEMORIAL HOSPITAL

By:    /s/ Becky L. Kalas
        Attorney for the Defendants
        Becky L. Kalas
        IL ARDC #:  6279983

Craig R. Thorstenson
cthorstenson@fordharrison.com
Becky L. Kalas
bkalas@fordharrison.com
FORDHARRISON LLP
180 N. Stetson Ave., Suite 1660
Chicago, IL  60601
Phone: (312) 332-0777
Fax:  (312) 332-6130

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that the foregoing **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was filed electronically with the Northern District of Illinois on November 11, 2022, and is available for viewing and downloading from the Electronic Case Filing (ECF) System.

Service of this Reply was accomplished electronically through the ECF System on the following ECF registered filing users:

Valentine Akpa, Plaintiff (Vanduit2018@gmail.com)

s/Becky L. Kalas
Attorney for Defendants
Becky L. Kalas
IL ARDC #:  6279983

Becky L. Kalas
IL ARDC #: 6279983
bkalas@fordharrison.com
FORDHARRISON LLP
180 North Stetson Avenue, Suite 1660
Chicago, Il 60601
(312) 332-0777 – Telephone
(312) 332-6130 – Facsimile

WSACTIVELLP:13558473.1

# EXHIBIT 1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3
     VALENTINE AKPA,                    )   No. 18 C 7512
4                                       )
                  Plaintiff,            )
5                                       )
              vs.                       )   Chicago, Illinois
6                                       )
     NORTHWESTERN MEMORIAL HEALTHCARE,  )
7    NORTHWESTERN MEMORIAL HOSPITAL,    )
                                        )   August 26, 2021
8              Defendants.              )   9:30 a.m.

9                 TRANSCRIPT OF PROCEEDINGS
10   BEFORE THE HON. GABRIEL A. FUENTES, MAGISTRATE JUDGE

11   APPEARANCES:

12
     For the Plaintiff:    MR. VALENTINE AKPA, Pro Se
13

14
     For the Defendants:    MS. BECKY L. KALAS
15                          Ford & Harrison LLP,
                            180 North Stetson Avenue, Suite 1660,
16                          Chicago, Illinois  60601

17

18

19

20

21

22                     PATRICK J. MULLEN
                      Official Court Reporter
23                 United States District Court
24         219 South Dearborn Street, Room 1412
                    Chicago, Illinois  60604
25                     (312) 435-5565

1    (Telephonic proceedings on the record.)

2    THE CLERK:  18 C 7512, Akpa versus Northwestern

3    Memorial Healthcare, et al., motion.

4    THE COURT:  Okay.  So good morning, everybody.  It's

5    Judge Fuentes.  Now that we're on the record, let's have

6    everybody make their appearances and state who they are,

7    starting with plaintiff.

8    THE PLAINTIFF:  Good morning, Your Honor.  Can you

9    hear me?

10   THE COURT:  I can, so go ahead and state your name so

11   that you make your appearance for our record, sir.

12   THE PLAINTIFF:  Yes, sir.  Good morning.  I am

13   Valentine Akpa, plaintiff, pro se.

14   THE COURT:  Very well.  Good morning.

15   Defense counsel, we'll have you make your appearance.

16   MS. KALAS:  Good morning, Your Honor.  This is Becky

17   Kalas appearing on behalf of the defense.

18   THE COURT:  All right.  Anybody else for the defense

19   today, Ms. Kalas?

20   MS. KALAS:  No, just me, Your Honor.

21   THE COURT:  All right.  Well, we're glad to have you

22   as well.

23   So what we're here on is Mr. Akpa's motion to extend

24   the discovery period by another 60 days to allow for another

25   eight depositions, possibly more, including (inaudible) who

1  he's indicated he wants to depose, and also to allow some

2  additional time for the production of additional documents.  So

3  I've reviewed that, and I've also reviewed the deposition

4  transcripts that Mr. Akpa provided in a separate exhibit.

5  Mr. Akpa, I obviously appreciate your clarification as

6  to why you submitted those.  It's a little unusual to see a

7  654-page exhibit of four depositions standing alone.  So when

8  those first came in, the Court didn't quite understand what was

9  going on.  But I certainly understood it after you filed your

10  motion and your additional filing.  So I thought the

11  depositions were helpful in terms of my getting a better

12  understanding of what's been going on in particularly the last

13  few weeks.

14  So I had some questions of the parties that I wanted

15  to go through, first with you, Mr. Akpa.  You've asked for this

16  work schedule to be produced, and you said that dates that

17  people were present at work is somehow relevant to your effort

18  to establish pretext.  You didn't say much more than that in

19  your motion about why that's relevant or exactly what issue the

20  work dates are directed at proving, so could you briefly today

21  tell me what that is?

22  THE PLAINTIFF:  Thank you, Your Honor.  Regarding the

23  work schedule, I believe I mentioned in the motion, motion 244,

24  that at some point Mr. Wilson had said that the work schedule

25  would help him determine when he was at work.  Also,

1   Mr. Michael Washington stated or testified that the work
2   schedule communicates when he starts work, and because we now
3   have an issue where an email on January 31st at 9:16 p.m. --
4           THE COURT:  I'm sorry.  You're not really that
5   audible.  You said there's an issue in which there's an email
6   in which, and then we lost you.
7           THE PLAINTIFF:  Oh.
8           THE COURT:  So if you would just kind of increase your
9   volume, what's going on with this email?
10          THE PLAINTIFF:  That email -- can you hear me now?
11          THE COURT:  Yes.  Although, God, your sound quality is
12  not good, but do the best you can.  What's going on with the
13  email?
14          THE PLAINTIFF:  Okay.  The email, in the email,
15  Mr. Washington stated that Mr. Bradley was away for a period of
16  three weeks in the month of January of 2018, and Mr. Bradley
17  disagreed with that email.  So the work schedule would
18  determine whether Mr. Bradley was at work in January of 2018,
19  and this is relevant because Mr. Washington said he reviewed at
20  least one of the application materials in 2018.  However,
21  Mr. Washington refused to disclose the month that he reviewed
22  one of the applications, and this will help us put a timeline
23  to the application -- the date defendant received the
24  application materials and the date they actually made the
25  decision regarding application materials.

1    THE COURT:  Okay.  Well, I'm not terribly persuaded by
2  why you said that's relevant, but I must note that many times
3  when I looked at the transcript, the portions where you said
4  people refused to answer, they didn't refuse to answer.  They
5  didn't know or they didn't remember.  So I would just caution
6  you.  Be careful to characterize the record accurately.

7    Let me go on to my next question.  Give me just a
8  moment while I'm reviewing my notes.  This is for Mr. Kalas.
9  So, Ms. Kalas --

10    Well, actually before I'm going to ask that of
11  Ms. Kalas, I have to ask you this, Mr. Akpa.  Is there a reason
12  why you continue to file discovery motions without complying
13  with 37.2, without certifying that you had a telephonic or
14  in-person meeting to try to resolve these issues?  I've gone
15  ahead to decide this motion because of the efficiency value of
16  doing that, but is there a reason why you won't do that?

17    THE PLAINTIFF:  Well, I apologize, Your Honor.  It's
18  not intentional.  You know, before I filed, I communicated with
19  defendants about, you know, providing me all of these
20  documents, and I believe that defendants have referenced our
21  communications in (inaudible).  I sent an email to, you know,
22  tell them what's missing and what they should provide me, and
23  even in the depositions defendants have stated that they will
24  not be providing something.  I apologize.  I apologize that my
25  motion did not reflect these communications.

1    THE COURT:  Yes, your apology most certainly is

2  accepted, and I'm going to go ahead and decide your motion

3  anyway.  Often I'll deny motions without prejudice when they do

4  not certify compliance with the rule.  I'll tell you that many

5  attorneys don't seem to understand the rule very well,

6  Mr. Akpa.  It cannot just be emailed.  Okay?  It requires an

7  in-person or a telephonic conference.  It requires

8  certification of who, what, when, and where did that conference

9  happen, and it requires if the conference didn't happen through

10  no fault of the person filing the motion that that be stated,

11  so very specific.

12    Just on general principles, read those rules

13  carefully.  I know I've entered previous orders that said that

14  I would enforce those rules, but we're now near the end of

15  discovery and I didn't want to burn up more time by denying

16  this motion and having you refile it a week or two later.  So

17  thank you for answering my question.

18    So, Ms. Kalas, Ms. Kalas, tell me about the server

19  that Mr. Akpa said was newly discovered and this pastoral care

20  email account that he's suggesting or indicating was either

21  newly discovered or he wants materials from those sources.

22  Maybe they were searched already and produced already.  I don't

23  know, but tell me about those, please, Ms. Kalas.

24    MS. KALAS:  Okay.

25    THE COURT:  Why shouldn't he get more discovery on

1  those two things right now?

2        MS. KALAS:  So I'll start out, Your Honor, with
3  generally that, you know, we've searched.  Northwestern has
4  searched and searched and searched, I mean, you know, every
5  source that they would have had, including the shared drive and
6  any shared email accounts, which the one we're aware of is the
7  clinical pastoral education account.

8        We haven't had any luck and haven't been able to track
9  down anyone who knows anything about a pastoral services email
10  account.  I think that's the name that Mr. Akpa has mentioned,
11  so I don't know whether someone was paraphrasing something.
12  But the common account that they use and have used for some
13  time is the clinical -- and certainly during the relevant time
14  period, is the clinical pastoral services account.

15        So I'm not sure where this other supposed shared email
16  account comes from.  If Mr. Akpa has more information about the
17  source that he believes exists, that might give me someplace
18  else to look.  But at least at this point in time, I'm going to
19  represent we searched everything that we could possibly search
20  and have produced, subject to confidentiality and privilege,
21  everything relevant that was responsive to his request from
22  those sources.

23        THE COURT:  But he did specify a particular email
24  address, pastoral_care@nmh.org.  So that's really what I was
25  asking about, whether that specific email address was searched

1  and whether documents were produced from it, if you know.

2  MS. KALAS:  So as it stands right now, Your Honor, I

3  can't say specifically that I have heard of or seen in talking

4  with my clients and the witnesses because I know this came up

5  in at least one deposition, you know, they were not aware of

6  this email account.  They were not familiar with that email

7  account --

8  THE COURT:  Okay.

9  MS. KALAS:  -- at least not at the time, at least not

10 at the time that we talked.

11 THE COURT:  Okay.  One moment.  I'm just looking at

12 something.  It's going to take me a moment to get there, so

13 bear with me for a moment.

14 MS. KALAS:  Sure.

15 THE COURT:  You know, in radio broadcasting, there's a

16 thing known as dead air and it's frowned upon, but in our

17 business dead air is fine.  So hold on.  Okay.  I've now lost

18 my place.  Give me just a moment.

19 (Brief pause.)

20 THE COURT:  Okay.  All right.  What I'm doing is I'm

21 looking at page 11 of the deposition of Alan Mark Bradley

22 because that is the portion that Mr. Akpa refers to.  Let's

23 see.

24 "Does the pastoral department" -- question -- "have

25 another email address that they use?

1             "Answer:  There is a pastoral services email that

2  sometimes is used in our department.  Pastoral services, I

3  think, is the title of it."

4             Let's see.

5             "Now, the reason I ask the question is during

6  discovery, an email address came up, and it's called

7  pastoral_care@nmh.org.  Are you aware of that email account?

8             "Say it again.  What is it?

9             "Pastoral_care@nmh.org.

10            "Answer:  I don't know what that one is.  I don't know

11  for sure."

12           So I have to say when I read that transcript, it

13  doesn't read to me like there's some newly discovered email

14  that the witness testified to in the deposition.  So given

15  that, I think I have to take counsel's representation that all

16  of the relevant emails the witnesses knew about or could tell

17  Northwestern Memorial Hospital about have been searched.

18           So let me see what my next question is for you,

19  Ms. Kalas.  It relates to Ms. Cerven.  Okay?

20           MS. KALAS:  Yes.

21           THE COURT:  So Ms. Cerven is described in the

22  deposition as a corporate representative, but she's also

23  described in the deposition as an in-house counsel.  We all

24  know that in-house counsel are capable of having privileged

25  communications and are capable of creating work product

1 protected material. We also know that under the law they

2 sometimes perform business functions, and when they perform

3 business functions the law is less friendly to their ability to

4 create privileged materials that really have nothing to do with

5 legal advice.

6 However, my concern is here there was discussion at

7 the deposition about her capacity, that she was there at the

8 deposition in the capacity as a corporate representative and,

9 therefore, not really a lawyer. I guess my concern is if she's

10 taking notes during depositions, aside from whether that would

11 be discoverable at this point on a general basis, why wouldn't

12 those be attorney impressions, mental impressions formed in

13 connection with or in preparation for litigation? Why wouldn't

14 they be?

15 MS. KALAS: Well, I believe they would be, Your Honor,

16 but I have to say that I was not -- my partner, Mr. Thorstenson

17 was present at the depositions where Ms. Cerven was acting as

18 the representative for Northwestern. So I think in order

19 really to answer that question, I would have to speak with her

20 to find out what those notes were about. I know that that's

21 less than helpful for purposes of today.

22 THE COURT: It is less than helpful, but I'll tell you

23 this. I don't see anything in any of the deposition records

24 that suggest that those notes were shared with any witness in

25 preparation for their deposition or that any witness was asked

1  to provide material shown to them and that that material was
2  included.  Really, that's about the only grounds on which I
3  could see that kind of material being discoverable, when it's
4  actually used to affect and influence the witness' testimony.
5  So that's my take on that, and it strikes me that they can't be
6  anything but attorney mental impressions.  You don't stop being
7  an attorney when you're sitting in a deposition where one of
8  your company witnesses is being deposed just because you happen
9  to be the corporate representative.  That would be my view of
10  the world on that.

11          Let me see.  More questions, more questions, let's
12  see.  Ms. Kalas, the four depositions that were filed -- and
13  also for Mr. Akpa's benefit, a lot of attorneys don't
14  understand this, either -- just because something is designated
15  as confidential under a protective order does not allow it to
16  be filed under seal and shielded from public view.  The public
17  owns these proceedings.  The public has a right to know what is
18  being submitted to underpin a judicial decision.  It's all
19  public unless one of the narrow criteria the Seventh Circuit
20  has set forth for sealing has been met.

21          So it's not just Rule 26.2, which just tells you how
22  to file something under seal.  There's good cause described
23  under that rule, but you have to look to the Seventh Circuit
24  law, cases like Union Oil of California v. Leavell, Bond versus
25  Uteras, Cincinnati Insurance.  There's several cases that I

1  cite to parties again and again and again, and those cases say

2  if it's privileged, if it's somehow required to be kept

3  confidential by some provision of law, if there's some other

4  particular reason that would justify sealing.  Sometimes it's

5  even a confidential settlement term that, if disclosed, would

6  discourage settlement.  Sometimes it's personally sensitive

7  information that could compromise someone's security.

8          All of those reasons can be reasons to seal something,

9  and in my scanning of these four depositions I saw no such

10  thing.  So I'm prepared to just unseal them all, Ms. Kalas, but

11  is there anything in there you feel you want to move to seal or

12  you want to tell me needs to be under seal, or do you want a

13  day or two to figure that out?  You tell me.

14          MS. KALAS:  No, Your Honor, there's nothing.  I did

15  have a chance to look.  There's nothing in those deposition

16  transcripts that we would designate as confidential.  You know,

17  I think what Mr. Akpa was doing was the confidentiality order

18  said they're confidential until 14 days after -- or within 14

19  days someone needs to designate any confidential piece of that.

20          THE COURT:  Right.

21          MS. KALAS:  There's nothing in there that's

22  confidential.  So apart from sort of, as you mentioned, the

23  oddity of just filing deposition transcripts, I mean, we don't

24  have anything that we would say couldn't be unsealed in those

25  transcripts.

1          THE COURT:  So, Mr. Akpa, the same question for you.

2     Is there anything in any of those four depositions that would

3     meet the Seventh Circuit's more stringent criteria for sealing

4     it from public view?  I've looked at quite a bit of the

5     transcripts, and quite a bit of them will underpin my decision

6     today.

7          THE PLAINTIFF:  No, Your Honor.  You know, if I was

8     (inaudible) that this request be, you know, open to the public,

9     so I only did it because of my understanding of the document

10    that was filed.

11         THE COURT:  Okay.  Mr. Akpa, I don't know if you're on

12    a speakerphone, but maybe if you'd go off of speaker we could

13    hear you better because I'm still having some trouble having

14    you come across.  So if you would do that, I would appreciate

15    it.

16         THE PLAINTIFF:  Of course.

17         THE COURT:  A couple more questions to you, Mr. Akpa.

18    So your motion mentioned possible additional motions you want

19    to file, including the taking of a break during Mr. Wilson's

20    deposition.  I thought we had resolved that.  Maybe we didn't.

21    Are you telling me that the break that Mr. Thorstenson took in

22    the Wilson deposition right before you called my court staff,

23    are you telling me that was a break that was taken when a

24    question was pending?

25         THE PLAINTIFF:  Yes, Your Honor, I believe so.  If you

1  look at, you know, page 4, I believe I referenced Mr. Wilson's

2  break and I forgot to also include the issue during

3  Mr. Bradley's deposition on page 33, paragraphs 5 to 9. While

4  a question was pending, these breaks were taken, and the

5  transcript would show it. I understand that, you know,

6  witnesses need breaks, but not in the middle of a question.

7  Mr. Wilson, for instance, was addressing my question when he

8  requested a break in the middle of the question. So that's --

9        THE COURT: I'm on page 33, and I'm not seeing that on

10  page 33.

11        THE PLAINTIFF: No, this is page 33, paragraphs 5 to 9

12  of Mr. Mark Bradley's deposition.

13        THE COURT: Oh, Bradley, okay.

14        THE PLAINTIFF: Yes, Your Honor.

15        THE COURT: Okay. Just one minute. I didn't ask you

16  about that, though. I asked you about the Wilson one. So at

17  page 48 or 49, you told me that there was a break taken while a

18  question was pending. But, gosh, Mr. Akpa, when I look at

19  actually page 47, line 19:

20        "Question: Did you interview HaLana Thompson on April

21  27, 2018?"

22        The answer at line 21:

23        "I don't know."

24        Then he says, the witness:

25        "Mr. Akpa, I'm going to need a break. If this is a

1  good moment for a break, I would like to take a break."

2       Then you say:

3       "Yes, I decide when that happens."

4       Mr. Thorstenson correctly told you that you do not

5  decide when that happens.  Okay?

6       But I'm a little concerned about the level of, you

7  know, accuracy of some of the representations I get from you,

8  including just now.  There was no question pending.  The

9  witness said he does not know.

10       THE PLAINTIFF:  That was --

11       THE COURT:  I'm going to look at Bradley, page 33 --

12       THE PLAINTIFF:  Okay.

13       THE COURT:  -- because I want to see about that.

14  Bradley, page 33, I'm almost there.  Your filing these

15  depositions was very helpful.  I can't tell you how much the

16  Court really did appreciate that.  So I'm on page 3 -- page 33.

17  Let's see.

18       "Did you talk about Akpa?"

19       This is a question that just asks about conversations

20  with Elizabeth Naccarato during the EEOC investigation, and

21  Mr. Thorstenson made an objection and he said:

22       "I need to go off the record for a second to explore

23  whether or not this implicates the attorney-client privilege."

24       So, Mr. Akpa, he's perfectly entitled, as I told you

25  when we were on the record at the Wilson deposition, to object

1  on the grounds that a question calls for a disclosure of a
2  privileged communication.  The disclosure of a privileged
3  communication is one of the rare times when an attorney at a
4  deposition can instruct the witness not to answer.

5  So he came back, Mr. Thorstenson did, on page 33, and
6  said he spoke with Jennifer Cerven about the nature of the
7  conversation and that they determined it was likely not
8  privileged.  Then he said:

9  "And, therefore, Mark" -- Mark Bradley -- "if you
10  recall what you and Beth may have talked about, you are free
11  to."

12  "THE WITNESS:  So I don't remember specifics of what
13  we talked about."

14  So, again, you know, I hadn't looked at page 33 before
15  we started today.  I had looked at page 47.  I was concerned,
16  again, about the accuracy of things that were represented to me
17  about what happened at these depositions, and my concern was
18  confirmed when you pointed me to page 33 of Bradley where there
19  was an interruption in the deposition when a question was
20  pending, but it was a perfectly proper interruption and you got
21  your answer.  So you answered my question, sir.

22  My next question to you is this.  When we took the
23  time during the Wilson deposition to deal with your objection,
24  did I understand you correctly to be representing to me that
25  you did not intentionally record my deputy but that she was

1  recorded inadvertently because of the nature of the Zoom

2  deposition that was being taken?  Did I understand correctly

3  that that's what you were telling me?

4       THE PLAINTIFF:  Your Honor, I did not intentionally

5  record her.  It was through Zoom.

6       THE COURT:  Okay.

7       THE PLAINTIFF:  Yes, it was through Zoom.

8       THE COURT:  Okay.

9       THE PLAINTIFF:  Yeah.

10      THE COURT:  You answered.  The answer to my question

11 then is yes, and you reiterated that today.  Do you want to

12 explain to me how the record then reflects before you went

13 on before that call with Ms. Jauregui and you said "please

14 record this"?

15      THE PLAINTIFF:  I said what?

16      THE COURT:  That seems intentional to me.

17      THE PLAINTIFF:  Sorry.  What was that?  Your Honor,

18 could you --

19      THE COURT:  When you say "please record this" and then

20 you have the conversation, it sounds intentional to me.  I want

21 to give you a chance to explain that.

22      THE PLAINTIFF:  Oh, okay.  No, I was speaking to the

23 court reporter to record the conversation that I was having

24 with the court deputy.  That's what I was referring to.

25      THE COURT:  Okay.  Then finally at the beginning of

1  the Wilson deposition, there are passages around pages 6, 7,

2  21, 22, where Mr. Thorstenson has to object because the video,

3  your video is not on.

4          THE PLAINTIFF:  Correct.

5          THE COURT:  And you indicate that there's some problem

6  turning it on.

7          THE PLAINTIFF:  Yes.

8          THE COURT:  I won't say magically, but certainly

9  abruptly you're able to turn it on when Mr. Thorstenson says

10  around pages 20 or 21 that if you don't he might have to walk

11  out of the deposition or call the judge or whatever, and then

12  magically your video is working.

13          So you can see how I might draw an inference there

14  that you didn't want to be on the video.  When he objected and

15  said it was part of the protocol that you be on the video, you

16  still left the video off at pages 6 and 7.  Then around 21 or

17  22, Mr. Thorstenson has to bring it up again, whereupon somehow

18  you managed to turn it on.

19          So I'm going to give you a chance to respond to

20  that --

21          THE PLAINTIFF:  Yes, Your Honor.

22          THE COURT:  -- because this has to do with how these

23  depositions are conducted and how you conduct them.  You're pro

24  se.  You get a lot of leeway, but you're not really permitted

25  to engage in what I would call abusive behavior at these

1 depositions. So explain that to me, the part about the video
2 being turned off, sir.

3          THE PLAINTIFF: Yes, Your Honor. You know, because of
4 the issue that arose when the court-appointed counsel was
5 representing me during the first time we scheduled the
6 deposition, I juggled to make sure that I have, you know, a
7 laptop that is working for the deposition. The laptop that I
8 got for the deposition, you know, the functioning is something
9 I wanted to get used to.

10          When we started that deposition that day, the video
11 was on. When we took a brief break, I turned the video off.
12 By the time I came back for the deposition, the video did not
13 turn back on. That was a struggle for me. So when
14 Mr. Thorstenson objected, at some point he insisted, so I asked
15 at least five minutes of recess to allow me to figure how to
16 get the video back on. When that recess was happening, what I
17 did was -- can you still hear me, Your Honor?

18          THE COURT: Yeah, there's some funny noises --
19          THE PLAINTIFF: Yes.
20          THE COURT: -- but I can still hear you.

21          THE PLAINTIFF: Okay. Sorry about that. So what I
22 did was I took the five-minute recess to disconnect everybody
23 from the Zoom and reconnect them to Zoom, and then the video
24 came back on. I had no intention to hide myself or block my
25 video from defendants' view.

1    THE COURT:  Okay.  I mean, I guess if you're referring
2    to the Wilson deposition --
3            THE PLAINTIFF:  Yes.
4            THE COURT:  -- I don't know that I see a break.  I see
5    the objection happens on page 7, and you state that you
6    disagree with Mr. Thorstenson's interpretation of the protocol.
7    Then Mr. Thorstenson says:
8            "If we continue without seeing you, we'll get the
9    judge on the line."
10           Then you went ahead with more questions.  At pages 7,
11   8, 9, no break.  Let's see, no recess on page 10.  No recess on
12   page 11.  No recess on page 12.  I'm just going to -- rather
13   than make a record of every page, I'm just going to go forward.
14   Let's see.  13, 14, gosh, I guess all the way up to 22 -- or
15   21, the record doesn't reflect that any recess was taken.
16   Instead, it reflects that Mr. Thorstenson had trouble hearing
17   you at page 21 and then insisted again on compliance with the
18   video protocol.  Then at that point, on page 22 there was a
19   five-minute break whereupon -- you know, you wanted a
20   five-minute break.  It's not clear how long the break was, but
21   one was taken at page 22 where you were able to get it
22   resolved.
23           So I'm going to give you the benefit of the doubt that
24   your recollection there was accurate.  I'm still concerned
25   about the fact that it was off in the first place.  I'm

1  concerned about these kinds of issues coming up again and
2  again.

3        I think that might be all the questions I have for
4  today.  Let me just look again at my notes.  I'll have a look.
5  Yes, I do.  Those are my questions, and I want to just briefly
6  give the parties a chance to say anything else they want to
7  say.

8        Mr. Akpa, you go first.

9        THE PLAINTIFF:   Thank you, Your Honor.  The other
10  issue I wanted to bring up is the conversation Ms. Naccarato
11  had with the 2018-19 CPE residents.  You know, Ms. Naccarato
12  during her deposition -- you know, courts have also allowed
13  discovery into Ms. Naccarato's investigation during the EEOC
14  investigation.

15        So the conversation with the residents in the course
16  of the litigation, plaintiff believes, is discoverable because
17  the question to Ms. Naccarato was whether she talked with the
18  residents and the answer was yes, and what they talked about
19  she did not -- she refused to discuss that, claiming that it
20  was privileged.

21        Now, plaintiff's position is that, you know, that
22  conversation was not about providing any legal advice, and
23  there was no attorney-client relationship.  Counsel for
24  defendants have represented that they are not, that the law
25  firm is not representing the four CPE residents.  So there is

1  really in plaintiff's view no legal barriers for any claim of

2  attorney-client privilege on the conversations Ms. Naccarato

3  had with the 2018-19 CPE residents regarding Akpa and this

4  case.

5         THE COURT:  Okay.  Ms. Kalas, anything further from

6  Northwestern Memorial Hospital or Healthcare?

7         MS. KALAS:  On that point or on any of the things you

8  had discussed, Your Honor?

9         THE COURT:  Anything at all you want to address.

10         MS. KALAS:  You know, I think the only thing that I

11  would really want to point out is with respect to the work

12  schedules.  I mean, I'm not sure where Your Honor was sort of

13  leaning.  We did provide and I'm familiar with the work

14  schedules that Mr. Akpa has represented.  They were part of --

15  on a weekly basis, Ms. Curran would send out basically a

16  spreadsheet that just said whether people were in or out.  We

17  did produce those, and I have Bates numbers for those,

18  particularly the ones for the week when the interviews were to

19  have taken place, and they all show that the three individuals

20  who conducted interviews were in during the days that they say

21  they conducted the interviews.

22         THE COURT:  Okay.  Okay.  Anything else, Ms. Kalas?

23         MS. KALAS:  I don't believe so on this point, Your

24  Honor.  You know, I think the only other thing that I might add

25  is that we have -- I guess I don't know that it really bears

1  on, I don't know that it really bears on what we're talking

2  about today, so I'm hesitant, but Mr. Akpa has filed a new

3  lawsuit naming a number of individuals who were involved in

4  this case.  I don't know whether this is something we should

5  talk with you about today.  I know that Mr. Thorstenson intends

6  to discuss it with Judge Lee tomorrow.

7          THE COURT:  Yes, I don't think there's anything for me

8  to do on that.

9          MS. KALAS:  Okay.

10         THE COURT:  So, gosh, I will tell you that I will do

11  my best to get you a ruling on Mr. Akpa's motion today so that

12  when you go in front of Judge Lee everybody will know, you

13  know, where everybody stands with discovery.

14         But, Mr. Akpa, as the person with the burden on the

15  motion because you're the movant, I thought a minute ago you

16  wanted to say something, and so I'll just give you an

17  opportunity to have the last word if there's something you want

18  to respond --

19         THE PLAINTIFF:  Thank you, Your Honor.

20         THE COURT:  -- to what Ms. Kalas has said.

21         THE PLAINTIFF:  Thank you, Your Honor.  First of all,

22  counsel said that they produced the work schedule.  That's not

23  accurate, Your Honor, and if she would point me to the Bates

24  number of the work schedule, that would be -- and the Court

25  right now, that would be fine.

1    The other issue that I forgot to mention is that
2  Mr. Bradley also testified to missing documents.  I noted these
3  on the motion to compel on page 45, paragraphs 19 to 20, page
4  46, paragraphs 10 to 14.  So those documents have not been
5  produced yet.  Those documents are clearly relevant because
6  they relate to Ms. Kathleen North-Wilhelm.

7    Then also Mr. Bradley identified, Mr. Bradley and
8  Mr. Wilson identified a couple documents; like the resume for
9  Ariell Watson is not produced.  What defendant produced is the
10  work history, which is different from the resume.  So these
11  two, the work cover sheet for Kathleen North-Wilhelm and the
12  resume for Ariell Watson has not been produced up till today.
13  That's what I wanted to add as well.

14    THE COURT:  Okay.  Now, I mean, I could have Ms. Kalas
15  respond to that, but in some ways I believe she already has.
16  She said that Northwestern Memorial conducted a reasonable
17  search for that and produced everything that they had.

18    So I guess I'll have you add anything that you want to
19  add, Ms. Kalas.  Any of those materials that Mr. Akpa is
20  referring to today or in his motion, were any of them withheld
21  from your production?

22    MS. KALAS:  No, Your Honor.

23    THE COURT:  Okay.  So I think I want to tell everybody
24  that I appreciate you answering my questions today.  I think
25  I've got the information I was looking to find out.  We'll rule

1  by ECF hopefully by the end of day today, and then you will

2  have your status in front of Judge Lee tomorrow.  So thanks,

3  everybody.  If there's any further status report or anything

4  like that necessary, it will be in the order that I issue later

5  today.  So we can adjourn.  Thank you.

6           THE PLAINTIFF:  Thank you.

7           MS. KALAS:  Thank you, Your Honor.

8       (Proceedings concluded.)

9              C E R T I F I C A T E

10          I, Patrick J. Mullen, do hereby certify that the

11 foregoing is an accurate transcript produced from an audio

12 recording of the proceedings had in the above-entitled case

13 before the Honorable GABRIEL A. FUENTES, one of the magistrate

14 judges of said court, at Chicago, Illinois, on August 26, 2021

15

16                          /s/ Patrick J. Mullen
                            Official Court Reporter
17                          United States District Court
                            Northern District of Illinois
18                          Eastern Division

19

20

21

22

23

24

25