UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VALENTINE AKPA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 18 C 7512 |
| | ) |
| NORTHWESTERN MEMORIAL HEALTHCARE and NORTHWESTERN MEMORIAL HOSPITAL, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

**CHARLES P. KOCORAS, District Judge:**

Plaintiff Valentine Akpa brings this action against Defendants Northwestern Memorial Hospital and Northwestern Memorial Healthcare (collectively, "NMH" or "Defendants") for alleged wrongful discrimination on the basis of race and national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Before the Court are Defendants' Motion for Summary Judgment (Dkt. # 295), Defendants' Motion to Strike Plaintiff's Local Rule 56.1(b)(3) Statement of Additional Facts (Dkt. # 308), and Plaintiff's Motion for Leave to Proceed with all 136 asserted facts in his Local Rule 56.1(b)(3) Statement of Additional Facts (Dkt. # 311). For the following reasons, Defendants' Motion to Strike and Plaintiff's Motion for Leave are granted-in-part and denied-in-part, and Defendants' motion for summary judgment is granted.

## BACKGROUND

I.   **Local Rule 56.1**

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The rule requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014); LR 56.1(a)(3). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. *Petty*, 754 F.3d at 420; LR 56.1(b)(3). Both statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* LR 56.1(d)(1)–(2).

Any fact not properly controverted is admitted. LR 56.1(e)(3). If the responding party disagrees with the other party's fact, it must cite specific parts of the record disputing the fact and "concisely explain how the cited material controverts the asserted fact." *Id.* Failure to properly controvert a fact results in its admission. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Facts that a party raises in a Local Rule 56.1 response that do not controvert the asserted fact, and that are not included in the party's statement of additional facts, are stricken. The Court also disregards legal arguments in the statement of facts. *See Cady v. Sheahan*, 467 F.3d 1057, 1060–61 (7th Cir. 2006). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a

forum for factual or legal argument." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000).

Local Rule 56.1(d)(5) provides, in relevant part, that "[a] movant's LR 56.1(a)(2) statement of material facts must not exceed 80 numbered paragraphs. An opposing party's Local Rule 56.1(b)(3) statement of additional facts must not exceed 40 numbered paragraphs. A party must seek the court's permission before exceeding these limits." LR 56.1(d)(5). Notwithstanding the limitations set forth in the Local Rules, Akpa submitted a statement of additional facts that includes 136 numbered paragraphs. Defendants moved to strike Akpa's statement of additional facts in its entirety, arguing that the majority of facts cite to materials that are not in the record. This is incorrect; all cited exhibits can be found in Dkt. # 309 and attachments thereto. Defendants also object to all facts beyond the 40 allowed by the Local Rules.

After Defendants filed their motion to strike, Akpa belatedly sought leave to proceed with all 136 paragraphs in his Local Rule 56.1(b)(3) statement of additional facts, claiming all 136 facts are "critical" to his case and necessitated by the "complex nature" of the case, his *pro se* status, and his inability to depose Defendants' expert.[1]

Akpa has not made a showing that the complexity of the case requires 96 statements of additional fact outside of the traditional 40. Akpa's motion for leave to proceed with all 136 is denied; however, the Court will exercise its discretion and allow Akpa double the amount contemplated by the Local Rules and consider Akpa's first 80

---

[1] Akpa does not explain why he was unable to do so.

paragraphs. Paragraphs 81-136 are disregarded. To the extent Akpa relies on paragraphs outside the parameters of this ruling, they are disregarded.

Additionally, in many instances, Akpa's record citations do not support his factual assertions. Akpa "either mischaracterized, drew tenuous and unsupported conclusions from, or omitted necessary context from the record. The Court will not consider these statements," nor will it consider any statements unsupported by admissible evidence. *See Little v. JB Pritzker for Governor*, 2021 WL 3666429, at *3 (N.D. Ill. 2021) (citing *Bone Car Int'l, LLC v. Pentech Pharm., Inc.*, 741 F. Supp. 2d 854, 856 n.1 (N.D. Ill. 2010) ("Where a party has offered a . . . statement of fact without offering proper evidentiary support, the Court will not consider that statement.")). The Court will disregard any facts that do not identify specific evidence in the record or are based only on general references to entire exhibits. *See* Fed. R. Civ. P. 56(c)(1)(A) (asserted facts must be supported by "particular parts of materials in the record"); *see also Compania Administradora de Recuperacion v. Titan Int'l, Inc.*, 533 F.3d 555, 562 (7th Cir. 2008) ("The district court cannot be expected to search through the entire record for evidence that may support a party's contentions; a party must point to specific evidence that creates a genuine issue of material fact for trial.").

## II. Factual Background

In resolving a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). The following admissible facts are taken from the record and are undisputed unless otherwise noted.

### *Northwestern Memorial Hospital's Clinical Pastoral Education Center*

NMH, as a Clinical Pastoral Education ("CPE") center, offers internships and residency programs through which it provides interdisciplinary consultation and teaching designed to assist students to learn and grow in the areas of pastoral formation, pastoral competence, and pastoral reflection. The residency at NMH builds on students' prior programs by emphasizing and encouraging student leadership throughout the pastoral context. As a teaching hospital, CPE programs are a vital part of the NMH, and the CPE program is integrated with other institutional programs at the hospital.

Rev. Dr. A. Mark Bradley is the Manager of Spiritual Care and Education for NMH. In this role, Bradley's responsibilities include managing spiritual care personnel and overseeing NMH's CPE program. Bradley is also responsible for selecting, interviewing, and making offers to candidates for CPE programs, and working with NMH's talent management and human resources departments to finalize hiring and onboarding of individuals who accept those offers.

Rev. Michael Washington and Gary Wilson, M.A., M.A.P.C., LPC are the two Association for Clinical Pastoral Education ("ACPE") certified Pastoral Care Educators who, along with Bradley, supervise the students during their time in NMH's CPE program. All three are staff chaplains at NMH.

The Spiritual Care and Education Group maintains a general email address at ClinicalPastoral.Education@nm.org. The email account is primarily monitored and administered by the Spiritual Care and Education Group's administrative assistant, Susan Curran.

### *Selection of the 2018/2019 CPE Residents*

Among the CPE programs offered at NMH is a one-year residency that begins in or around August of each year. In 2017 and 2018, NMH's internal hiring policies and procedures required that onboarding processes such as drug screening and background checks had to be initiated and completed within certain time periods relative to the employee's start date.

Bradley began accepting applications and conducting interviews in the fall of 2017 for the 2018/2019 residency program. According to Bradley, in evaluating whether a residency candidate meets expectations, the team looks at a combination of clinical competence and interpersonal skills as reflected in the candidates' CPE evaluations.

On January 9, 2018, on Bradley's behalf, Curran emailed residency offers to Ariell Watson and Kathleen North-Wilhelm.[2] North-Wilhem and Watson both

---

[2] Akpa disputes any offers were made prior to January 31, 2018. In support of this contention, Akpa points to a January 31, 2018, email from Washington to Daniel, in which Washington states that Bradley had been away for three weeks, that Washington could not answer Daniels' question about the timing of decisions about residencies, and that it had been decided before Bradley was out that they would not respond before the team met. This email does not, however, establish that offers were *not* extended to North-Wilhelm and Watson on January 9, 2018. The Court notes that there are three weeks between January 9 and January 31.

accepted their offers by email on January 10, 2018, and January 20, 2018, respectively. On February 8, 2013, a residency offer was emailed to Joshua Daniel. Daniel responded by email on February 16, 2018, and accepted the offer.[3] The offer emails instruct the recipient to "Please note that this offer is contingent upon your successful completion of Northwestern Medicine's Human Resources on-boarding process, including a background check. CPE residents are hospital employees and are subject to both the requirements and benefits of being hired by Northwestern. Our Human Resources department will provide details about salary, benefits, etc." Dkt. # 298-1, at 69. Watson, North-Wilhelm, and Daniel are White.

Prior to February 24, 2018, Bradley determined that he wanted to fill the fourth residency position with one of two individuals—HaLana Thompson or Stiofan O'Murchadha—who were then-current interns in the CPE program. Bradley's Outlook calendar indicates that both individuals were interviewed on April 27, 2018, although an email from Curran indicates that O'Murchadha's interview was scheduled for March 23, 2018. Washington does not recall interviewing O'Murchadha, and Wilson

---

[3] Akpa attempts to question the authenticity of the offer emails by claiming that the "metadata does not authenticate the purported offer email[s] as to authorship or fact." Dkt. # 305, ¶¶ 17–18. However, Akpa asked his expert to opine with respect to the emails in which Watson, North-Wilhelm, and Daniel accepted the offers from Defendants "[w]hether the email is altered in any way." For each of the emails, the answer was "no." Dkt. # 309, at 24–30. That there were "official" offer emails from the HR department in June and July of 2018 does not negate the offers made in January and February 2018. The explanation for the formal offers is found in the body of the January and February emails, where it is noted that the offers were contingent upon completion on the HR process.

did not recall reviewing O'Murchadha's application materials.[4] Bradley, however, testified that he remembered reviewing the application.[5]

On May 25, 2018, Curran (on Bradley's behalf) emailed an offer to Thompson, and Thompson accepted the offer on May 31, 2018.[6]

On June 15, 2018, Bradley emailed Daniel and Thompson, informing them that, although they were previously offered and accepted the residency position, they needed to officially apply online and go through NMH's HR process.[7] A formal "Offer of Employment" was extended to Daniel by an HR Talent Acquisition Professional on June 28, 2018. Formal offers were extended to North-Wilhelm and Thompson on July 10, 2018.

### *Valentine Akpa*

Akpa is a Black person of Nigerian origin. On February 13, 2018, Akpa emailed the CPE program's email address and inquired about the timeline for the summer CPE

---

[4] Paragraph 25 of Akpa's statement of additional facts states that Washington testified that he did not see or review O'Murchadha's application materials. This is a complete mischaracterization of the testimony Akpa cites in support of this "fact." The cited testimony states that Washington did not recall reviewing the materials, not that he did not review them.

[5] Akpa says Bradley acknowledged O'Murchadha did not meet the qualifications that they wanted or expected for the residency at NMH. Again, this is a gross mischaracterization of the record. The cited testimony does not reflect this in any way. In fact, on page 177 of his deposition, Bradley specifically stated choosing between Thompson and O'Murchadha was a very difficult decision. Dkt. # 298, at 176–77.

[6] Akpa again attempts to dispute this fact by arguing the metadata does not "authenticate" Thompson's reply email. However, Akpa's own expert concluded that the acceptance email was not altered in any way. Akpa also claims that "forensic evidence" shows that Thompson's application materials were created on June 29, 2018. All the cited material supports is that a version of the application was "created" on June 29. The fact remains that her application materials are dated March 29, 2018.

[7] There is no evidence in the record of similar emails going out to North-Wilhelm or Watson.

8

program and asked if there were any residency positions available. Curran responded that day, indicating that they were interviewing for the summer program but there were spots available and Akpa was welcome to apply. She attached information about the CPE program and stated, "if after review you would like to consider the summer, please follow all of the steps for application." Dkt. # 298-1, at 76. Defendants say Curran did not advise Akpa that there was a residency opening or otherwise provide residency information in her response.[8]

On February 24, 2018, Akpa submitted application materials for the residency program. His race and national origin were reflected in his application materials. Two days later, Curran responded and informed Akpa that his application was incomplete. By March 1, 2018, Akpa had submitted all required materials and Curran informed him that his application was sent to the supervisors for review.

On March 20, 2018, Curran emailed Akpa to advise him that the interview process for the CPE residency program was complete. The email stated, "[t]his year we had a tremendous interest in our program and an unusually high number of qualified applicants, like yourself. We have found ourselves with more qualified applicants than available positions." Dkt. # 298-1, at 88.

---

[8] On multiple occasions, Akpa mischaracterizes his email exchange with Curran. Akpa states that Curran sent him CPE residency application materials and told him there were still spots open in the *residency* program. What Curran's email actually states is there were still spots open in the *summer* program, and the materials attached were directed to the summer program, not the residency program. However, whether Curran sent residency-specific materials to Akpa is not an issue of material fact.

Akpa replied and asked for elaboration, given that he had not been interviewed. Curran responded the next day and explained the high interest in the program and that offers had been made and accepted. Curran stated, "[a]t this time our residency program has been filled and is now closed." Dkt. # 298-1, at 89. Defendants admit this was an incorrect statement and concede they continued to receive applications after March 21, 2018, and interviewed O'Murchadha, Thompson, and one other applicant, Toni Daniels, after that date as well.

With respect to his qualifications, Akpa's application materials reflected that he had a bachelor's degree in philosophy and an unspecified degree in public administration, and he was working toward a master's degree in law ministry with a concentration in health care chaplaincy. Akpa had also volunteered with or been employed by religious organizations such as Catholic Charities and St. Anselm Church.

At his deposition, Bradley did not recall what specifically led him and his team to conclude that Akpa did not meet their expectations, and no documents were provided to him to refresh his memory. Having since reviewed Akpa's application materials, Bradley was able to recall that in determining that Akpa did not meet expectations, Bradley was not impressed with the reputation of the program where Akpa did his one and only unit of CPE, as Bradley's opinion is that NMH's CPE program is significantly more rigorous than that program.

10

### *HaLana Thompson*

As noted above, the fourth residency spot was ultimately offered to HaLana Thompson, an African American[9]. Thompson first submitted her application materials to Curran on March 29, 2018. Thompson received her Masters of Divinity in 2018 and had worked as a pastor's assistant and as Director of Christian Education and Spiritual Formation at Quinn Chapel African Methodist Episcopal Church for four years.

While Bradley considered the qualification materials in both Akpa's and Thompson's application materials, his view was that Thompson's work with the NMH CPE program made her a better candidate than Akpa. Bradley knew Thompson's qualifications and had observed her performance during her internships. He felt she would be a good fit for the residency.[10]

Akpa testified that he had no knowledge regarding Thompson's credentials, background, or discussions with Bradley about the residency program, but admitted he felt Thompson was well-qualified.

---

[9] Akpa disputes Defendants' "characterization" of Thompson as African American because there is no testimony directly from Thompson about her race. However, Bradley testified as to Thompson's race, and Akpa himself concedes Thompson is African American when he accuses Defendants of using Thompson to "circumvent the EEOC investigation." Dkt. # 298, at 73. Thus, it is undisputed that Thompson is African American, the same race as Akpa.

[10] Akpa claims Bradley testified that he was concerned about Thompson's group dynamics/interpersonal skills. The cited testimony does not support this claim at all. The only mention of Thompson on page 173 is that she and O'Murchadha were in the same internship unit. On the following page, in response to Akpa's questioning as to why they waited for Thompson to complete her second CPE unit before offering her the residency position, Bradley stated, "it was about group dynamics. We thought it would be better to wait till the end because Stiofan and HaLana were in the same group, and we thought that would be better for the group dynamics that to – you know, wait till after it was over." Dkt. # 298, at 176.

*EEOC Complaint*

Elizabeth Naccarato is the Program Manager, HR Compliance and Policies at NMH. One of Naccarato's responsibilities is to manage and respond to charges of discrimination and lawsuits against NMH. On June 8, 2018, the EEOC notified Naccarato that Akpa filed a charge of discrimination against Defendants. This was the first time Defendants received notice of the charge.

At his deposition, Akpa refused to answer questions regarding whether anyone at NMH had said anything inappropriate to him regarding his race or national origin, and objected on relevance grounds.[11] When asked about the bases for his discrimination claims against NMH, Akpa stated that his claims were based on friends of his having been rejected for CPE programs and the number of black versus white individuals in the program.

Based on the above, Akpa filed a complaint against Defendants alleging unlawful discrimination based on race and national origin, in violation of Title VII and 42 U.S.C. § 1981. Defendants now seek summary judgment on all counts.

## **LEGAL STANDARD**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[11] Akpa concedes he objected to these questions, but points out that, at the same time, he testified that he did not have the documents to properly allow him to respond to the questions. Why Akpa would need documentation to answer those simple yes or no questions, the answers to which are within his personal knowledge, is a mystery to the Court.

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). In determining whether summary judgment is appropriate, the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (cleaned up). The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. And the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Akpa brings his race and national origin discrimination claims under both 42 U.S.C. § 1981 and Title VII, which the Court reviews under the same legal standard. *See Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020).

Title VII makes it unlawful for an employer "to fail or refuse to hire . . . any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). At summary judgment, the critical question is whether the plaintiff has produced enough evidence to permit a reasonable factfinder to conclude that his race or national origin caused the adverse employment action. *Chatman v. Bd. of Educ. of Chi.*, 5 F.4th 738, 746 (7th Cir. 2021). To answer that question, courts look at the evidence holistically. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016) ("[A]ll evidence belongs in a single pile and must be evaluated as a whole.").

However, employing the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as Defendants do here, is one way parties can assist the Court in sifting through the evidence to assess whether discrimination under Title VII and Section 1981 is established. *See Alamo v. City of Chi.*, 2021 WL 633355, at *2–3 (N.D. Ill. 2021). Under that approach, the plaintiff must first produce evidence establishing a four-part prima facie case: (1) he was a member of a protected

14

class; (2) he applied for and was qualified for the position sought; (3) he was rejected for the position; and (4) the employer hired someone outside the protected group who was not better qualified than the plaintiff. *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728–29 (7th Cir. 2013).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 728. "For a failure-to-hire claim, one example of a legitimate, nondiscriminatory reason a defendant may offer is that 'the individuals ultimately hired were better candidates' than the plaintiff." *Chatman*, 5 F.4th at 746 (quoting *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 724 (7th Cir. 2018)); *see also Scruggs v. Garst Seed Co.*, 587 F.3d 832, 839–40 (7th Cir. 2009) (explaining that, when hiring for a research assistant position, an employer had a legitimate, nondiscriminatory reason to select someone with experience as a research assistant for the company).

If the employer supplies a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to produce evidence that the defendant's reason is pretext for discrimination. *Johnson*, 733 F.3d at 728. In this context, pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). Courts have also referred to pretext as an employer's efforts to cover their tracks or hide their real reason for not hiring an applicant. *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). Yet, "a showing of pretext alone is not enough;

15

the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 740 (7th Cir. 2013).

"The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action." *Scruggs*, 587 F.3d at 838; *see also Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 473 (7th Cir. 2002) ("It is not always necessary to march through this entire process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof."). We do so here.[12]

Here, the undisputed evidence shows that hiring manager Bradley had legitimate, nondiscriminatory reasons for selecting Thompson instead of Akpa. Bradley and his team did not select Akpa to move forward with an interview because he did not meet their expectations for a resident at NMH. And, at the time Akpa applied, Bradley had already concluded that he wanted the final spot to go to either Thompson or O'Murchadha, the then-interns with whom Bradley was familiar and had personally supervised. That Defendants interviewed Thompson, O'Murchadha, and one additional candidate after Akpa was told the position was filled, does not suggest that Defendants lied about their concerns with Akpa's qualifications and experience.

---

[12] The Court notes, however, that Akpa failed to establish his prima facie case with respect to his race discrimination claim because it fails on the fourth element. Thompson, the individual selected for the one residency position open at the time Akpa applied, is also African American (and, in Bradley's view, was better qualified for the position).

To be sure, Defendants admit Akpa met the minimum qualifications for the CPE residency program. However, in Defendants' view, Thompson was chosen for the position because she was better-qualified. And when an employer's proffered non-discriminatory reason for hiring an individual other than the plaintiff is that it selected the most qualified candidate:

> evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.

*Mlynczak v. Bodman*, 442 F.3d 1050, 1059−60 (7th Cir. 2006). Akpa has not shown this to be the case here.

Akpa argues he is more highly qualified than Thompson, but Akpa's opinion about his and Thompson's relative qualifications cannot, without more, defeat summary judgment. *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 726 (7th Cir. 2008) ("[The plaintiff] also relies on her own assessment of [a comparator's] qualifications as against her own, but this is insufficient to show pretext."); *Millbrook*, 280 F.3d at 1181 ("A plaintiff's contention that he is the better candidate for a vacancy constitutes nothing but the employee's own opinion as to his qualifications. This cannot create an issue of material fact because an employee's perception of his own performance cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities.") (cleaned up); *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("[The plaintiff] also stated that, in her opinion, she was

17

more qualified for the dispatcher positions than either of the two drivers who was hired. It is well settled, however, that a plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions.").

The Court "is not a super personnel department that second guesses employers' business judgments." *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 895 (7th Cir. 2016) (cleaned up). And, "absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII." *Millbrook*, 280 F.3d at 1176 (quoting *Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001)). Akpa has not produced any such evidence.

Again, at the summary judgment stage "the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of*" his protected class. *Carson v. Lake Cnty., Ind.*, 865 F.3d 526, 533 (7th Cir. 2017) (emphasis in original). Considering the evidence as a whole, the Court concludes no reasonable factfinder could conclude that Akpa was not hired *because of* his race or national origin.

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Strike [308] and Akpa's Motion for Leave [311] are granted-in-part and denied-in-part as set forth above, and Defendants' motion for summary judgment [295] is granted. Judgment is entered in

favor of Defendants on Akpa's race and national origin discrimination claims. Civil case terminated.

    It is so ordered.

Dated: August 21, 2023

_____
Charles P. Kocoras
United States District Judge